UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KASSEM MOHAMED SALAMEY,

        Petitioner,

                                CASE NO. 2:09-CV-12201
   v.                           JUDGE DENISE PAGE HOOD
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

MARY BERGHUIS,

        Respondent.

_____/


## REPORT AND RECOMMENDATION


*Table of Contents*

I.     RECOMMENDATION…………………………………………………………………2
II.    REPORT………………………………………………………………………….……2
     A.    *Procedural history*……………………………………………………………2
     B.    *Factual Background Underlying Petitioner's Conviction*…………………..……4
     C.    *Standard of Review*……………………………………………………………23
     D.    *Loss of Exculpatory Evidence*……………………………………………..……25
            1. Clearly Established Law……………………………………………………25
            2. Analysis……………………………………………………………..………27
     E.    *Sentencing Claim*……...………………………………………………………28
            1. Clearly Established Law……………………………………………………29
            2. Analysis…………………………………………………………………..…29
      F.    *Ineffective Assistance of Counsel*………………………………………………31
            1. Clearly Established Law……………………………………………………31
            2. Failure to Investigate and Call Witnesses………………….…………......…32
            3. Failure to Object to Inappropriate Evidence………………………………34
     G.    *Recommendation Regarding Certificate of Appealability*…………………..…...34
            1. Legal standard………………………………………………………………34
            2. Analysis……………………………………………………………..………36
     H.    *Conclusion*……………………………………………………………………36
III.   NOTICE TO PARTIES REGARDING OBJECTIONS…………………………………37

              *       *       *       *       *


I.      **RECOMMENDATION**: The Court should deny petitioner's application for the writ of

habeas corpus. The Court should also deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.     Petitioner Kassem Mohamed Salamey is a state prisoner, currently confined at the Brooks Correctional Facility in Muskegon, Michigan.

    2.     On October 24, 2007, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529, and conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.529 and MICH. COMP. LAWS § 750.157a, following a jury trial in the Wayne County Circuit Court. On December 7, 2007, he was sentenced to concurrent terms of 12-20 years' imprisonment on each count.

    3.     After the trial and prior to filing his appeal, petitioner filed, through counsel, a motion for a new trial on April 26, 2007, in the Wayne County Circuit Court. An evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973), was held on August 24, 2007, and September 14, 2007. Thereafter petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW DUE TO THE INEFFECTIVENESS OF HIS TRIAL COUNSEL FOR FAILURE TO INVESTIGATE AND ESTABLISH ALL SUBSTANTIAL DEFENSES AVAILABLE TO [PETITIONER]; FAILURE TO INVESTIGATE AND INTRODUCE RELEVANT AND MATERIAL EVIDENCE AVAILABLE TO HIM WHICH DIRECTLY CONTRADICTED THE CREDIBILITY OF THE ALLEGED CO-CONSPIRATORS AGAINST [PETITIONER] , DETRACTS FROM THE ALLEGED MOTIVE FOR THE ROBBERY AND REFUTES [PETITIONER]'S OPPORTUNITY TO COMMIT THE ROBBERY; FAILURE TO OBJECT TO THE ADMISSION OF A VIDEO SURVEILLANCE TAPE THAT HAD BEEN EDITED TO DELETE VITAL INFORMATION CRITICAL TO [PETITIONER]'S DEFENSE; FAILURE TO SEEK APPROPRIATE RELIEF FOR THE [RESPONDENT]'S DESTRUCTION OF EVIDENCE; FAILURE TO OBJECT TO THE ADMISSION OF THE VIDEO SURVEILLANCE TAPE DUE TO

DISCOVERY VIOLATIONS; AND WAIVER OF SENELLA GANT'S TESTIMONY, WHICH DIRECTLY CONTRADICTED THE TESTIMONY OF THE VICTIM, TYSON JANISCH, AND FAILURE TO CALL MOHAMED SALAMEY AS A DEFENSE WITNESS.

II.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AND HIS RIGHT TO PRESENT A DEFENSE DUE TO THE PROSECUTION'S EDITING OF THE CRIME SURVEILLANCE VIDEO, THEREBY CREATING A LOSS OF EVIDENCE THAT WAS CLEARLY POTENTIALLY EXCULPATORY THEREBY DEPRIVING [PETITIONER] OF HIS RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES CONSTITUTION AMENDMENT VI AND XIIII [sic].

III.    [PETITIONER] IS ENTITLED TO RE-SENTENCING DUE TO THE TRIAL COURT'S IMPOSITION OF AN EXCESSIVE AND DISPROPORTIONATE SENTENCE BASED UPON INACCURATE INFORMATION, AND THE COURT'S PREVENTION OF [PETITIONER]'S ALLOCUTION PRIOR TO THE IMPOSITION OF SENTENCE.

IV.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL DUE PROCESS OF LAW DUE TO HIS CONVICTION BEING AGAINST THE GREAT WEIGHT OF EVIDENCE.

The court of appeals found no merit to petitioner's claims and thus affirmed his conviction and sentence. *See People v. Salamey*, No. 275102, 2008 WL 3876102 (Mich. Ct. App. Aug. 21, 2008) (per curiam).

4.      Petitioner, proceeding through counsel, sought leave to appeal the first three issues raised in the court of appeals to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Salamey*, 483 Mich. 894, 760 N.W.2d 489 (2009).

5.      Petitioner, proceeding through counsel, filed the instant application for a writ of habeas corpus on June 7, 2009. As grounds for the writ of habeas corpus, he raises the following three claims:

I.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

II.     PETITIONER WAS DENIED HIS RIGHT TO DUE PROCESS AND HIS RIGHT TO PRESENT A DEFENSE DUE TO THE PROSECUTION'S EDITING OF THE CRIME SCENE SURVEILLANCE VIDEO AND THE PROSECUTION'S FAILURE TO PRESERVE MATERIAL EXCULPATORY EVIDENCE FROM THE SURVEILLANCE VIDEO.

III.     PETITIONER WAS DENIED HIS CONSTITUTIONAL DUE PROCESS RIGHT NOT TO BE SENTENCED ON THE BASIS OF INACCURATE INFORMATION

6.     Respondent filed her answer on November 3, 2009. Respondent contends that petitioner's claims are without merit. Respondent concedes that none of petitioner's three habeas claims are barred from habeas review due to failure to comply with the statute of limitations, failure to exhaust state court remedies, or because they are procedurally defaulted.

7.     Petitioner filed a reply to respondent's answer on November 11, 2009.

B.     *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was adequately summarized in the respondent's answer (adopted from the prosecutor's brief on appeal to the Michigan Court of Appeals):

> Tyson Janisch testified that in March of 2005, he was employed as a manager of retail gas accounts by Atlas Oil Company and had been so employed for five years (Jury Trial Transcript, 10/17/06, 169). He had around 60 gas station accounts that he was responsible for (170). He also opened a gas station called the Fast Track Gas Station located at 14845 Alter in Detroit (170). Atlas Oil actually built the station and he staffed it and opened it for business in November of 2004 and ran it until December of 2004, when it was leased to Mohammed Salamey (171). He trained Mohammed and his son Kassem to run the day-to-day operations of the business (172-173). He identified [petitioner] in court as the son Kassem (172). The Salameys in turn paid Atlas Oil rent and also purchased all of their gas from Atlas (173). The gas station remained one of his accounts (173).

4

Initially, the Salameys would receive gas on one day and three days later an electronic funds transfer from their account would occur by which they would pay for the gas (173). By mid-January, however, the electronic transfers for the fuel received were bouncing (174). Under normal circumstances when that happened, Atlas would require payment for the gas upon delivery (177), but a special arrangement was worked out with the Salameys where any gas paid for by credit cards would come directly to Atlas, and, as far as gas paid for with cash, he [Janisch] would, on a day-to-day basis, figure out how much gas had been sold in exchange for cash and he would go and collect the amount in cash that was owed to Atlas, and deposit it in Atlas's account (178). The Salameys would retain their own margin of the cash over the cost of the gas supplied by Atlas (179). Both Mohammed and [petitioner] were aware of this arrangement (178).

He [Janisch] went to the Salameys' gas station daily Monday through Friday and sometimes on the weekend (179-180). The amount he would collect on a daily basis was roughly $5,000 to $6,000, but it all depended on the amount collected in cash on any given day (180). When he didn't go on the weekend, he would make his collection on the following Monday (180). When he did make a collection on any particular day, he would meet with either Mohammed or [petitioner] to go over the cash receipts and make the settlement; he met with [petitioner] more often than he did with Mohammed when doing this (180). What normally occurred was that he would go the office at the gas station and get the spread sheet from their computer, from which he would find the volume of gas sold and multiply that by Atlas's cost for that amount and come up with a total, after which, [petitioner] or Mohammed would count out the cash and he'd double count (181). Then, they'd both sign a receipt and each of them would keep a copy and he would go deposit the cash that he collected in Atlas's bank account (181). He would always call before he came, either calling the gas station itself and asking for Mohammed or [petitioner], or calling them on their cell phones, and would tell them what time that he expected to be there (182). At that time, he was driving a 2004 black Pontiac Grand Prix, which was the car that he would drive to the gas station, and he would usually wear the same coat, a black and green rain-type coat (183). He always came by himself and never carried a weapon; he would park as close to the door as he could (183).

On March 21, 2005, he called [petitioner] at around 11:00 a.m. to let him know that he would be coming by at around 1:00 p.m. (184). He had not collected any cash that weekend and so he was picking up the cash receipts for the previous Friday, Saturday, and Sunday (184). He got to the gas station at around 1:30 or 1:45 (184). He followed his usual procedure: parking his black Grand Prix by the front door, and he was wearing his green and black coat (185). When he walked into the gas station, he asked for [petitioner] and they went back to the office and figured out the receipts (185). He knew for sure when he got to the gas station that Vonique Campbell and Senella Gant, the two cashiers, were there (186); he had actually hired these two people when he opened the gas station in November of 2004 (174-175).

That day, the cash receipts that he was taking with him totaled $19,124, which again, were the receipts from the previous Friday, Saturday, and Sunday (187). After the money was counted and double counted, [petitioner] left the gas station and he himself hung around for five or ten minutes to say hello to the cashiers (187). He recalled [petitioner] having told him that he was leaving the gas station after they got done (188). He put the cash, which was bound in bank bands, in a white plastic bag (188). This was what he usually did when he was collecting for the whole weekend; on the weekdays, when the receipts were smaller, he would just stuff the money in his coat pocket (189).

He recalled, when he parked his car and walked into the gas station, seeing two men sitting on a picnic table and drinking pop to the right of the front door (189). He took notice of these two individuals because they had been warned by the police to be careful about carrying money in that area (190). When he came out of the gas station, with the $19,124 he had collected in cash receipts, the two men he had seen as he was going in, ran up to him and demanded his money; one of the men had a gun (191). While the one held the gun on him, the other grabbed his coat, his wallet, and the bag with the money in it and ran towards Alter and rounded the corner of the gas station, after which he lost sight of them (191-193). His cell phone was in his coat pocket (192).

After he was robbed, he went back into the gas station and asked the cashiers to call the police; one of the cashiers had already hit the panic button behind the counter (194). When the police arrived, he gave them the information about the robbery (194). While he was waiting for a detective to show up to take his statement, he saw, from the store, the police surround a house on Alter a couple of yards away (194-195). About a half hour later, [petitioner] came back to the gas station (195). Cortez, whose last name he did not know, but who he remembered from training people at the gas station (175), came around the same time (195); Cortez was a person who worked at the gas station but he hadn't hired him (175).

The witness was shown People's Exhibit No. 1 and identified it as containing a number of spread sheets showing what he had picked up in cash from the gas station on a given day (200). The first sheet had the date of March 21, 2005 on it, but it was for the sales of the previous day, March 20, 2005 (200). The date of March 21, 2005 was handwritten on the sheet and signed by both him and [petitioner]; the amount he received in cash for the cash sales of March 20 was $4,646 (200). The next sheet showed the actual day of the cash sales being March 19, which he and [petitioner] signed and which showed the amount he collected as $5,805 (201). And the next sheet showed the cash sales for the date of March 18, 2005, which he and [petitioner] signed and which showed the amount he collected to be $8,673 (201). Those cash amounts were for the sales which occurred on Friday, Saturday, and Sunday (202). People's Exhibit No. 1 also included bank deposit slips that he would make out for the amount of cash received on a given day, which he would fill out at

the bank, not at the gas station (202). And Exhibit No. 1 also showed the spread sheets for days previous, one of which was dated and signed March 14 by him and Mohammed Salamey for sales pertaining to March 13, showing cash disbursed to him in the amount of $4,601, another dated and signed by him and Mohammed March 13 for sales pertaining to March 12, amounting to cash disbursed to him in the amount of $5,370, and another dated and signed by him and Mohamed March 12 for sales pertaining to March 11, with cash disbursed in the amount of $7,203 (202-204). He knew, from looking at the records on People's Exhibit No. 1, that he had gone to the gas station on at least one of the weekend days of the weekend of March 12-13, and when he went and picked up cash on the weekend, he could not deposit it then, but had to wait until the following Monday to do so, but still the money he collected on any given weekend day would be kept in the Atlas Office, not at the gas station (204-205). He also testified that he would make out a separate deposit slip whenever he picked up cash at separate times, such as when he picked up cash on the weekend of March 5-6; he and [petitioner] signed a sheet on March 5, a Saturday, for the sales on March 4, a Friday, and they signed a sheet on March 6, a Sunday, for the sales on March 5 - he made out two separate deposit slips for these, even though he deposited both amounts on the same day, March 7, the following Monday (205-206).

Finally, the witness identified People's Exhibit No. 3 as stills from a video tape of the gas station (208-209). One still showed him in his black and green coat, another showed him leaving the gas station with the bag containing $19,124 in his hand, another showed his black Grand Prix in front of the gas station, another showed him being approached by the two men who robbed him, and it actually showed one of the men pointing a gun, and another showed the two men running towards Alter Road (209-211).

On cross-examination, the witness testified that after the Salameys leased the gas station from Atlas Oil, it was their call as to who they hired as employees (Jury Trial Transcript, Vol. I of II, 10/18/06 (6)). He testified that he did not review the application of Cortez, whose name he did not know (7). He may, however, have discussed Cortez's application with the Salameys (8). He testified that after the Salameys starting leasing the gas station, he would come to the gas station three or four times a week and he would have contact not only with the Salameys, but with the workers, so that the workers would have been familiar with his comings and goings and would have been aware of his picking up cash receipts (9-10). In fact, there were other employees who would sign the cash receipt sheets when neither of the Salameys was there (10).

On redirect examination, the witness testified that he never went over the cash receipts with Cortez (18). He also testified that when he was on his way to pick up the cash receipts, he would call the gas station with his cell phone, and, whenever he talked to people at the gas station by phone, it was with his cell phone (18). His

cell phone number was 313-350-4583 (18). Finally, he testified that [petitioner] was known as Kass (19).

Vonique Campbell testified that until May of 2006, she was employed as an assistant manager at the gas station (Jury Trial Transcript, Vol. I of II, 10/18/06 (20)). She had been so employed since October of 2004 (20). When she started, Tyson Janisch was managing the gas station, and, when the Salameys took over management, she stayed as an assistant manager (21). She trained new cashiers and assisted Kass Salamey in hiring people and also paid vendors and did office work when neither Salamey was there (21-22). She would continue to see Janisch when he came to the gas station, but she never knew until March 21, the day of the robbery, that he was collecting money (22). She had never engaged in squaring accounts with Janisch (23).

She started work on March 21 at 6:00 a.m. (23). Working with her that day were Senella Gant, Tanika Beard, and Cortez Chenault (23). Senella was a cashier (24). Cortez was hired sometime in January or February of 2005 (23). He sometimes worked as a cashier, but mostly he was in the back stocking the cooler (24-25). Tanika was sent home by Kass that day at about 11:00 a.m., after the morning rush was over (25). She identified [petitioner] in court as the person who she was referring to as Kass (26).

At around noon, Cortez came up front and started talking to her (26-27; 29). She had told him that she was staying in a hotel and he asked if he could come and visit her and she told him no (27). Then [petitioner] came up front and told Cortez to stop bothering her and to go do his work (27). Cortez got upset with that and went to the back and she started hearing bottles and stuff falling (27). [Petitioner] then went in the back and Cortez came back up to the front and kicked a rack over and then left and went across Mack and stood in the front of a Family Dollar store (27). Meanwhile, she had asked [petitioner] if he wanted her to call the police and [petitioner] told her no; this was when Cortez was still in the gas station (27). She was surprised at Cortez's reaction to [petitioner] telling him to stop bothering her and to get back to work (28). She thought that Cortez was waiting to catch a bus because he stood across the street (30). Then, when Tyson showed up, she saw Cortez wave his hands; she didn't know what that was about (30). Tyson then came in the gas station and he and [petitioner] went to the back for awhile (34).

Then, [petitioner] came up and said he was leaving, that he had to go pick his mom up at the airport (30). Tyson left the building after [petitioner] did and she witnessed Tyson get robbed (31). What she saw was one man with his arm where Tyson had a bag of money and the other was taking off Tyson's coat (32). She also saw a gun (32). The two men then ran towards Alter, and Tyson ran back in to the building (33). When she saw that, she pressed the station's panic button (31). She then called [petitioner] on her cell phone and told him about what she had witnessed

and [petitioner] said that he was coming back (31). When the police arrived, she told one of the officers about the camera that the gas station had (33-34).

On recross examination, the witness testified that when she saw Cortez across the street waving his arms, when Janisch showed up, she did not see anybody with him (44).

Cortez Chenault testified that he was charged with one count of armed robbery and one count of conspiracy to commit armed robbery relative to this case (Jury Trial Transcript, Vol. I of II, 10/18/06, 65). He entered into a plea agreement with the Prosecutor's Office whereby he pled guilty to the conspiracy count and received a sentence of 3 to 20 years in exchange for his testimony against [petitioner] (65-68).

He testified that [petitioner], who he referred to as Kass (75), had been his boss at the Wow gas station at Mack and Alter, but his relationship with [petitioner] got to the point where they became friends and they would socialize outside of work (72). He also knew Tyson Janisch, who used to come to the gas station and train people (73). Janisch was the person who he had conspired to rob (74). How this came about was that one day, [petitioner] was counting money and [petitioner] said to him, "Wouldn't it be fun if all of this was ours?" (75). He thought that [petitioner] was just joking (76). A couple of weeks later, which would have been a month or so before the robbery, [petitioner] said that they should rob Tyson and asked him if he knew anybody who would do that (79). He knew that Tyson used to pick up money from the gas station; the money he picked up was for the gas that was delivered to the gas station by Tyson's company (79-80). He told [petitioner] that he could get his cousin, Ronald Scott, to do it (81; 83). So, that day, he called his cousin, using the gas station cell phone (82). The number he called Scott at was 839-5038, which was where Scott stayed (84). When he called Scott, he asked Scott if he wanted to do a robbery and if he knew anybody who would do it also and Scott said that he did (85-86). He then told Scott that he would call him back when he got the details (85). [Petitioner] was present when he talked to Scott on the phone (85). He ended up calling Scott later that day and telling him that they weren't going do it (86-87).

The subject came up later, two weeks before the robbery (88-89). [Petitioner] brought the subject up again (88). [Petitioner] asked him if his cousin still wanted to do it; he told [petitioner] that he would call his cousin and see (89). So, he called Scott at the same phone number and Scott said that he was still interested (90). He told Scott about Tyson, the intended victim, and about how much money Tyson would have, which, [petitioner] told him, would be about $30,000 (90; 96). [Petitioner] was present when he talked to Scott this second time, and this time, [petitioner] talked to Scott as well; he heard [petitioner] tell Scott that Tyson was a white guy and that he was scary (91). [Petitioner] also told Scott that he didn't want anything to happen to Tyson (92). Scott told him (the witness) that he was going to

get another person involved, a person named Mike, but when the actual robbery went down, Scott had another person with him, that being Shawn Fegan, known as Snoop, not Mike (94). They were all going to split the money, and, after the robbery, he was supposed to go over to Scott's house and get the money (96-98). He ended up giving Scott's number to [petitioner] (98-99), and he knew that [petitioner] talked to Scott on the phone at least three times because he was present for those conversations (100).

On the actual day of the robbery, March 21 (99), he [Chenault] was at work and [petitioner] asked him if he wanted to do it that day, and he responded that it didn't matter to him (101-102). So, he called Scott and told him that Tyson would be at the gas station at about 1:30 p.m. and for him to come up there; he got the information about when Tyson would be there picking up money from [petitioner] (102). [Petitioner] talked to Scott as well and told Scott not to hurt Tyson; [petitioner] told him that Tyson was a scary (sic) [scared] person and also that he wouldn't have a gun, so that he wouldn't need a gun, but that if he brought one, not to shoot Tyson or anything (103-105). He told [petitioner] that morning that he was going to cause a disturbance at the gas station so that he could leave, so as not be there when the robbery happened (105-106). [Petitioner] agreed to this plan and said that he would send him home when he caused the disturbance (106-107). So, that morning, he came out and kicked over some displays and left (108). He didn't go home, but went across Mack to a Family Dollar store (108). It was then that he saw Scott and his boys coming down Alter Road (108). He went and talked to them, Scott, Mike, and Snoop, on the side of the gas station (109). They told him that they were going to wait on the picnic tables and he told them that he was going back across the street (110). That's when he found out that another person other than Mike was involved and that a gun was involved (110). Mike didn't want to be involved in the actual robbery either, so he went with him across the street to watch for the police (111). The plan, as discussed between him and [petitioner] that morning, had been for the two robbers to sit on the picnic tables on the side of the gas station and wait for a signal to let them know when Tyson arrived, and that he would be standing across the street acting as a look-out (110-118). The plan for after the robbery was for the three men to go to a green house on Ashland, behind and not far from the gas station, where he and [petitioner] would then pick them up, after which they would divide up the money (119-120). While he and Mike were standing across the street, he called [petitioner] and [petitioner] told him that Tyson was on his way (121). Then Mike called [petitioner], but he did not know what they talked about (121).

When Tyson showed up, which was later than expected, Mike made a signal to Scott and Snoop, as was the plan (125). When Tyson walked into the gas station, he [Chenault] started walking down Alter and Mike stayed in front of the Family Dollar (125-126). Then, he [Chenault] met up with [petitioner] on Alter, and he and [petitioner] just sat in [petitioner's] car, behind the gas station (126). They could see Scott and Snoop from where they were seated (128). He then saw Scott and Snoop

jump up and then he saw them running (129). Then, he and [petitioner] pulled off and went to Ashland to pick up Scott and Snoop at the house where they were all supposed to meet (130). [Petitioner] dropped him off there and Mike walked up (131). He and Mike found out that Scott and Snoop were not at the house so he told Mike to call Snoop to find out where they were (131). Eventually, Mike got a hold of Snoop but Snoop would not tell him (the witness) where they were (32). So, he (the witness) went home and Mike went with him (132-133). The next thing that happened was that Scott called him and told him that they were in a house and that the police had the house surrounded (132). Then he called [petitioner] and told him what was happening (133). About an hour later, he went back to the gas station, where he saw the police arresting Scott and Snoop (132-135). [Petitioner] was already at the gas station when he went back there (135). He then told [petitioner] that he was going home (135).

Later, [petitioner] came to his house (136-137). Mike's dad was also at his house, as was Snoop's dad (137). He told [petitioner] that his cousin, Scott, had gone to jail and that they needed to get him out; [petitioner] agreed (137). Snoop's dad also tried to scare [petitioner] out of some money to get his son out on bond as well; [petitioner] agreed to try to help (137-138).

On cross-examination, the witness [Chenault] acknowledged having given a statement to the police on April 3, 2005 (Jury Trial Transcript, 10/18/06, Vol. II of II, 172-176). He acknowledged that he did not tell the police that he also planned the robbery in that statement, nor did he tell the police that Michael Boyd was with him across the street giving signals, nor did he tell them that he was in a car with [petitioner], nor did he tell them that he threw down merchandise and left the store, nor did he tell them that he was going to get a split of the proceeds (177- 180). He didn't tell them these things because they didn't ask him, although he acknowledged that they did ask him what happened (177-178).

Also on cross, the witness acknowledged that he knew that Tyson Janisch would come to the gas station and pick up money (184-185). He also acknowledged that during the time he was working there, in particular between the time he and [petitioner] talked about the robbery and the actual day of the robbery, he used [petitioner's] cell phone (197). The witness denied that it was he who waved his hands when Tyson showed while he (the witness) was across the street (209). He testified that it was Mike who waved his hands to give the signal that Tyson had arrived, but it was he who told Mike that that was Tyson, which prompted Mike to wave his hands (209). He testified that Mike was standing right next to him across the street (209-210).

Ronald Scott testified that the previous witness, Cortez Chenault, was his cousin (Jury Trial Transcript, 10/19/06, 28). He knew that in January and February of 2005, Cortez was working at the Wow Fast Track gas station at Alter and Mack (28).

[Scott] testified that he was charged in this case and ended up pleading guilty to armed robbery with the conspiracy to commit armed robbery charge being dismissed and for a sentence of 5 to 15 years imprisonment (29-30).

[Scott] testified that Cortez was the first person to bring up the robbery (30). This was by way of phone (32); Cortez called him at his mother's house, 839-5038 (37). He had caller ID on that phone and he saw that the call was coming from the Wow Fast Track gas station (37). Cortez asked him if he wanted to make some money (32). He told Cortez that he did and then Cortez put his manager on the phone and he talked to the manager (32). He had never met Cortez's manager before (32). The manager told him about the robbery, who the victim would be, and how much the guy would have on him; the manager said that the guy would have $20,000 in a bag (33). He did not recollect if the manager told him about the guy during that phone call, but he knew that the manager at some point did tell him that the guy was a tall, white guy, that he would be driving a black Grand Prix, and that he would be wearing a green jacket (33-34). And the manager told him that the guy would be coming up to the gas station on Monday, March 7 (34). He described [petitioner] in court as Kash (sic), Cortez's manager (35). After that, he got in touch with Michael Boyd and told him where they could get $20,000 and then he gave Boyd all the details (37-38). Cortez and Kash, however, had told him that the money was going to be drug money (39). He told Boyd that they would have to go and get a gun (40). He knew that Boyd didn't have a gun; he got Boyd involved because he needed somebody to drive him to the robbery (40-41). Boyd, in turn, contacted Fegan because Boyd knew that Fegan had a gun (43).

On March 7, 2005, a Monday, he and Boyd were at his house and Boyd got a call on his cell phone from somebody at Wow Fast Track (46). Because Boyd had caller ID, the number showed up on Boyd's cell phone and they simply called the number back (50). Then, he and Boyd went to pick Fegan up and then they went to a house on Alter close to the gas station, where they waited for another phone call from Kass, letting them know that Tyson was on his way (50-52). Another call came to Boyd's cell phone (52). It was Cortez, telling them that it wasn't going to go down that day, because the money came up short (55). Then, Cortez told him that Kass would explain it further and Kass got on the phone and said that there wouldn't be enough money (55). Kass then told him that they would do it the following week: March 14 (57). But when March 14 came around, he heard from Cortez, who told him that it wouldn't be happening on that day either (57). He, in turn, told Boyd this (58).

On the following Monday, March 21, he heard from Cortez in the morning; Cortez told him that the money would be there that day and asked him if he was still in (59). He did not talk to Kass (59). He then called Boyd, who said that he was still interested and Boyd came over to his house and then they went and picked up Fegan

(60). Initially, the plan was to split the money four ways, between he and Boyd, and Cortez and Kass [petitioner]; this was because initially, he and Boyd were going to do the robbery, there was no fifth person (61). Then, the plan developed where he would get half the money, which he would split with his cousin Cortez and Boyd and Fegan would get the other half (62-63). Once he and Boyd picked Fegan up, they drove to the home of one Jamira, which was close to the gas station, where they waited for a phone call from Cortez and Kass, telling them when Tyson would be coming up (65). While at Jamira's, they got the phone call and were told what time that Tyson would be there (68-69). He got two separate phone calls, one from Cortez and one from Kass (69). In the conversation he had with Kass, Kass told him that Tyson was a friend of his and not to shoot Tyson because he wouldn't have a gun and he was going to be scared already (70-71).

He and Fegan left Jamira's to go do the robbery (75). Boyd left with them also but he walked in front of them, as they all walked down Alter (76). He had told Boyd that he and Fegan would do the robbery and for him to go down the street and watch out for the police (76-77). He and Fegan sat down on the benches outside of the gas station (77). Meanwhile, Boyd was across Mack, standing with Cortez (78). At one point, he went into the gas station and bought two pops (78). When he went in there, he saw a female cashier and Kass [petitioner]; Kass was leaning over getting something out of the drawers (80). He heard Kass speak to the female cashier (81). It was the same voice that he had heard over the phone; when he talked on the phone, the person who he was talking to, whose voice he recognized, identified himself as Kass (81). He didn't say anything to Kass while he was in the store; he just walked back out after making his purchase (82).

He went back to the benches and sat with Fegan until he saw Tyson pull up (82-83). He knew it was Tyson from the description Kass had given him; Tyson pulled up in a black Grand Prix and was wearing a green coat (83). At that point, Cortez called him on the phone and told him that that was Tyson; he never did get any signal from across the street (83). He and Fegan didn't rob Tyson as he was going into the gas station because Kass had told him that Tyson would have the money in a bag when he came out of the gas station (84). Kass had told him that this would be the money he (Kass) gave Tyson (84); he got this information from one of the phone calls he had had with Kass (84-85). Then, he and Fegan robbed Tyson (85). He took Tyson's bag and made him take off his coat while Fegan held the gun and pointed it at Tyson (85). He took the coat just in case Tyson had a cell phone in it, so that Tyson couldn't call the police (86). He and Fegan then went back to Jamira's house and counted the money (87). The amount of money in the bag was roughly $19,000 (86). 45 minutes later, the police were all on Alter, so he and Fegan hid the money in the attic and they hid in the attic as well, under the insulation (89-92). He himself took off his pants and one of his shirts so as not to fit the description (90). Eventually, the police came into the house and they found him and Fegan and they also found the gun and the money (92).

13

On cross-examination, the witness testified that he never had a face-to-face conversation with [petitioner]; all of his conversations were by telephone (102). He testified that from the very beginning, his plan was to cut Cortez's manager out of the proceeds of the robbery, but he never told Cortez this (111-112). He testified that the reason that he did not want Boyd involved in the robbery itself was because Boyd was fat and slow (119). He testified that when he went into the store to buy two pops, [petitioner] was stooping down with his head up, so that he could see his face (136).

Detroit Police Officer Mark Amos testified that he was one of the police officers who responded to the robbery scene on March 21, 2005; this was around 2:15 p.m. (Jury Trial Transcript, 10/19/06, 174-175). At the scene, he received information that the perpetrators of the robbery were at a particular address on Alter (175). He and other officers went to that address and were allowed admittance by the occupant, Jamira McKinley (176-177). Their cursory search around the house uncovered nothing, and they left, but they returned when the robbery victim stated that he was 100% sure that the robbers had gone to that address (178). They were allowed admittance again by McKinley who told them that they wouldn't find anything (178). This time, he went to the closet area of the master bedroom upstairs, where he saw insulation coming from the attic (178-179). He went into the attic, where he found Scott and Fegan hiding under the insulation (179-180). He also found a green and dark-colored jacket, a gun, a cell phone, and the money stolen (179-181).

Detroit Police Officer Brett Letwin testified that he responded to the robbery scene at Wow Fast Track gas station on March 21, 2005 (Jury Trial Transcript, 10/23/06, 7). When he got to the scene, he talked to the victim Tyson Janisch, from whom he got a description of the people who robbed him (9-10). He also talked to another witness, Miss Kim Jones, who saw where the robbers had run to, which was 3680 Alter (10).

Detroit Police Investigator Maurice McClure testified that he became the officer in charge of this case on the evening of the robbery (Jury Trial Transcript, 10/23/06, 15). As part of his duties, he went to the gas station three or four days after the robbery (15-16). There he came into contact with [petitioner] (16). His purpose for that contact was to get a copy of the surveillance tape that was in the computer inside the gas station (17). [Petitioner] was supposed to burn a copy of the tape from the computer's digital hard drive (17). He asked [petitioner] for this several times and [petitioner] would say that he was working on it, but that he didn't know understand how to get the computer (17). [Petitioner] told him that the hard drive would rewrite itself every 10 to 15 days and the data would be erased (17). After he asked [petitioner] several times for the computer, he obtained a search warrant to get it (17-18). His only alternative was to break into the office to get it, but the owner, [petitioner's] father, Mohammed Salamey, came and opened the door and he took the

14

computer (19). He downloaded the data onto a videotape and a CD-ROM (19). He identified People's Exhibit No. 6 as the videotape (20).

As officer in charge, he also obtained phone records from Nextel Communications relative to [petitioner's] cell phone number: 313-304-8406 (26; 29). He also was able to obtain the phone number for Ronald Scott's mother's phone, that phone number being 313-839-5038 (28). He saw on the Nextel Communications records that there had been phone calls from [petitioner's] cell phone to Scott's mother's phone on March 7, 2005, consisting of two outbound calls from [petitioner's] phone to Scott's mother's phone and one from Scott's mother's phone to [petitioner's] phone (29). There was an outbound call from [petitioner's] cell phone to the cell phone of Tyson Janisch, at 313-350-4583, on March 21, 2005 (30). He found another record of a number of calls to another cell phone with the number 313-449-2965, which was registered to one Carmen Washington, with an address in Southfield; Michael Boyd used the same address and he found out that Boyd also used that cell phone (31). [Petitioner's] cell phone records showed that on March 21, 2005, the day of the robbery, there were at least eight outbound calls from [petitioner's] cell phone to Boyd's cell phone before the robbery; these eight calls occurred after the one outbound call from [petitioner's] cell phone to Tyson's cell phone (34). Then, there were at least six outbound calls from [petitioner's] cell phone to Boyd's cell phone after the robbery (34). There were also calls made from Boyd's cell phone to [petitioner's] cell phone (34). There were four calls from Boyd's cell phone to [petitioner's] cell phone before the robbery, between 1:26 p.m. and 1:39 p.m., and one, which was one minute before the robbery, at 2:17 p.m., and then, there were six cell phone calls from Boyd's cell phone to [petitioner's] after the robbery, between 2:19 p.m. and 2:23 p.m. (35). Cortez's mother's phone number was 313-417-1901 (32). There were seven calls to this number from [petitioner's] cell phone after the robbery, at 2:34 p.m. (32). Finally, he found a call from [petitioner's] cell phone to Cortez's aunt number, 417-3852, at 3:55 p.m. on March 21,2005 (33).

On cross-examination, the witness testified that the surveillance video tape that he made covered the time period from no more than a half hour before the robbery and a half hour after (52). He was asked if any of the stills from the video tape showed Ronald Scott inside the gas station; he responded that they did not (52).

Michael Boyd testified that in March of 2005, he knew Ronald Scott; Scott lived across the street from him (Jury Trial Transcript, 10/23/06, 58). He also knew Shawn Fegan, who was a friend of his, and he knew Jamira McKinley, also a friend (58). He testified that he had initially been charged in this case with armed robbery and conspiracy to commit armed robbery and he ended up pleading guilty to the conspiracy charge and receiving three years probation with a year in jail in exchange for his testimony (59-61).

As far as his involvement in this case, he got involved when Ronald Scott called him on the phone and asked him if he wanted to make some money (63). He told Scott that he would be over when he got home (63). When he got over to Scott's, Scott got his cousin, Cortez, on the phone and Cortez asked him if he wanted to make some money doing a robbery (64). He knew Cortez, and he knew that Cortez worked at the Fast Track gas station at Mack and Alter (65). Cortez told them that the money was drug money and what the guy looked like and how they would split the money (66). When Scott got off the phone with Cortez, he and Scott talked about how they were going to do the robbery (67). They were going to do the robbery with a gun, but neither of them had a gun (68). Because they wanted to use a gun for the robbery, he called Shawn and asked him if he wanted to make some money (70-71). He told Shawn that Cortez's manager wanted to take some drug money; he got the information about the involvement of Cortez's manager from Cortez and Scott (71). When Shawn agreed to get involved, he and Scott went over to pick him up to go do the robbery; this was the same day that they got the phone call from Cortez (71). Once they picked up Shawn, they went over to his uncle's house to wait for a call from Cortez and his manager (72).

The call came to his phone (73). Around that time, he was using the cell phone of his girlfriend's cousin, Carmen Washington; the number on the cell phone was 313-449-2965 (69). The call came from Cortez; Cortez asked him if they were ready (74), and he also asked him if they had a gun (83). Then Cortez's manager got on the phone and told him how Tyson looked, that he was a white male, that he was kind of goofy and tall, what kind of car he would be driving, where he would pull up, how much money he would have (77), that being $20,000 (78), what kind of bag he would have the money in, that being a plastic bag, and that if the money wasn't in a bag, it would be in his coat (84). He also told him not to shoot Tyson (75). Then, he got another call (86). It was from Cortez, advising him that the robbery wasn't going to happen that day, but next week, the reason being that there wouldn't be enough money this day (86). He never did get a call the following week (87). The next time that he got a call was on the day of the robbery itself; that was at around 9:30 a.m. (87-88).

The call came from Scott, asking him if he still wanted to do it (89). He did, so he and Scott went and picked up Fegan (89). While in the car, Scott told him that he wasn't going to split the money with Cortez or Cortez's manager (90). Scott said that they'd split the money amongst themselves over at Scott's house (91). He (Scott) would get $9,000 and the two of them would get $11,000 to split among themselves (90).

So, they went over to Jamira's house on Alter Road, close to the gas station, to wait for another call from Cortez or Kass (92). When they got to Jamira's, a lot of phone exchanges occurred with Scott talking on the phone (93-94). Some of the calls came to his cell phone and he saw that some of the calls were from Kass's cell phone

(94). He himself talked to Cortez and he told Cortez about Fegan being involved; Cortez told him that Fegan would have to be paid out of their share of the split (95). When they left Jamira's, Scott and Fegan went to the gas station and sat on a picnic table to the right of the gas some and he went across the street from the gas station to a Dollar Store to act a look-out (96-99). Before they left Jamira's, Kass called and told them that Tyson was on his way (96). While he was standing across the street, he got a call from Cortez, asking him where he was (99). He told Cortez where he was and Cortez joined him (99-100). He had a discussion with Cortez then, wherein Cortez asked him what house they would be at (100). He told Cortez that they would be at a green house on Ashland; he told Cortez this lie because they were going to cut Cortez and his manager out of the money (100). While he and Cortez were standing across the street, he (the witness) received a phone call from Kass; Kass told him what time Tyson would be arriving and where he would park (102). Kass told him he was calling from the gas station (104-105). He relayed the information that Kass gave him to Fegan (104). While he was on the phone with Fegan, Fegan told him that Scott had gone into the gas station to buy pop (105). He himself saw Scott come out of the gas station and go back to the picnic table (105).

Then, he saw Tyson show up and park in front of the gas station (106). He then received a call from Kass, in which Kass told him that they were counting the money and that Tyson would be out in about ten minutes; he relayed this information to Fegan (107). He then saw Tyson come out of the gas station (112). Before Tyson came out, Cortez left from across the street (110). When Tyson came out, Scott and Fegan ran up to him and Fegan pulled a gun on him (113). Scott and Fegan took Tyson's bag and his coat and ran towards Alter (113). He himself started walking to Ashland, where he told Cortez that they would all meet up (114). As he was walking, Cortez called him and asked him where he was; he told Cortez where he was (115). Cortez told him that he was with Kass (15). Cortez then showed up with another man on Ashland (114). He identified [petitioner] in court as the person Cortez showed up with (114). That was the first time that he ever saw [petitioner] (114). [Petitioner] dropped Cortez off and Cortez asked where the other guys were and also asked him if they were playing him and Kass for the money (116-117). Then, he received a phone call from Kass, the same person who he had talked to before (118). Kass told him to tell Fegan that the police were on their way to a house (118). He called Fegan and told him this and Fegan said that he already knew this (118). He (the witness) knew the house they were in; they were at Jamira's (118-119). He was able to see from where he was that the police had Jamira's house surrounded (119). Then, Kass called him and told him that a neighbor was at the gas station and said that she knew what house (120). He watched the house for awhile and then he and Cortez went to Cortez's house (121). When they got there, Kass [petitioner] came over and asked him if Scott and Fegan were trying to run off with the money (122). When Kass said this to him, he recognized the voice from the person he had talked to on the phone before who had identified himself or had been identified as Kass (123; 79-81). Kass then took off, saying that he had to go back to the gas station to talk to a detective

(122). He and Cortez remained at Cortez's mother's house and then Kass came back about an hour later (124). Kass asked him if he thought that Scott and Fegan would tell on them; he told Kass that he didn't know (125). Then Kass said that he would try to raise the money for their bonds (125). Other people started showing up at Cortez's mother's house, one of the people being Fegan's father (127). Fegan's father wanted to know if Kass was going to get his son out of police custody; Kass said yes (127).

Answer, at 4-17.

After trial and prior to filing his appeal, petitioner filed a motion for a new trial in the Wayne County Circuit Court. The court held a two-day evidentiary hearing on the motion. At the evidentiary hearing, petitioner first presented the testimony of his trial attorney, Jeffrey Edison. Edison testified that he was retained as counsel at trial for petitioner. *Ginther* Hr'g Tr., dated 8/24/07, at 13. Edison described the prosecution's theory of the robbery as being "the result of a conspiracy between [petitioner] the manager-owner of the gas station, and an employee of the gas station, together with the employee's friends who orchestrated the actual robbery." *Id.* at 14. Edison testified that at some point, the Salameys discussed with him that Senella Gant signed a receipt on Saturday, March 19, 2005 [the weekend before the robbery]. *Id.* at 20. Based on such a receipt, "there would have been a question as to Janisch's credibility, as to whether he was present at the gas station on that Saturday when he testified that he was not." *Id.* at 21. Edison did not receive such a receipt in the discovery. *Id.* at 22. He did receive other receipts showing pick-ups by Janisch on Saturday, March 19, and Sunday, March 20. *Id.* at 23. Edison did not confront or question Janisch about these receipts and whether or not Janisch was telling the truth about not picking up any money the weekend before the robbery. *Id.* at 24. Edison testified that "the heart of [petitioner's] case to me was that the witnesses were liars; that they had an interest in lying against [petitioner] to minimize the consequences against themselves. . ." *Id.* at 25. The clip of the surveillance video provided to the prosecution and shown at trial only portrayed the one minute of the robbery. Edison was aware that

Cortez Chenault had testified to sitting with petitioner in petitioner's car, two houses away from the gas station. *Id.* at 31. Edison was also aware of Vonique Campbell's statement that she did not remember Ronald Scott coming into the gas station before the robbery to buy pop. *Id.* at 36. On cross-examination, Edison testified that his trial strategy was not to attack Janisch's credibility but rather that Chenault would have also been privy to the same information as petitioner about Janisch's pick-up and the possibility of Janisch carrying in excess of $19,000. *Id.* at 43. Edison did not recall exactly when the Salameys had showed him the receipt signed by Senella Gant, whether it was before or after he waived her as a witness. *Id.* at 47. Mohamed Salamey, petitioner's father, discussed the surveillance tape with Edison and the expansive perimeter of the area monitored by the video surveillance, and Edison had followed up by speaking with the prosecution about the tape. *Id.* at 48. Edison did not recall the specifics of what Salamey had told him about what was captured by the video surveillance the day of the robbery. *Id.* at 49. Edison had visited the gas station himself and knew what could be seen from various vantage points. *Id.* at 49. On redirect examination, Edison agreed that the March 19 receipt signed by Janisch and Gant provided the same pick-up information as the March 19 receipt signed by Janisch and petitioner, but Edison said it also "could have possibly raised an issue on Janisch's credibility, and may have provided an additional factor to argue." *Id.* at 54.

Petitioner next presented the testimony of Mohamed Salamey, his father. Salamey testified that he owned the Fast Track Gas Station in the City of Detroit in question in this case. *Ginther* Hr'g Tr., dated 9/14/07, at 4. Beginning February 22, 2005, about a month before the robbery in question, Janisch had begun picking up the daily proceeds for gasoline as a representative of Atlas Oil. *Id.* at 5-6. If Salamey or his son were not present, any employee on duty at the station would sign the

receipt for the pick-up of the proceeds. *Id.* at 7. Looking through the receipts beginning February 22, Salamey confirmed that employee Latisha Hodges signed the February 22 receipt, that employee Mr. Harris signed the February 25 receipt, that petitioner had signed several receipts, that he himself had signed some of the receipts, and that Janisch had signed all of the receipts. *Id.* at 7-11. There had been about seven other robberies at the station. *Id.* at 15. In addition to the nine video surveillance cameras already at the station, the Salameys added three more cameras on February 27. *Id.* at 16. The cameras showed the entire perimeter of the gas station, including Alter Road. *Id.* at 17. There was a brick wall behind the station along Alter Road. *Id.* at 18. The only way to preserve the images from the surveillance cameras, which were fed into a computer, was to download them to a disk. *Id.* at 19. All twelve camera views could have been watched simultaneously. *Id.* at 19. After the robbery, three police officers watched the surveillance videos with petitioner and Janisch; Detective McClure came out to the station that evening but did not view the tapes. *Id.* at 22. The day after the robbery, McClure and another detective returned with a search warrant and took with them the hard drive with the video surveillance images. *Id.* at 22-24. McClure said, "If it's up to me, you and your son be in jail tonight." *Id.* at 24. When Salamey finally got the hard drive back, the images were gone. *Id.* at 25. Salamey heard Cortez Chevault testify that he, Chevault, sat with petitioner in petitioner's white car on Alter Road; Salamey testified that petitioner's car was a dark gray Grand Am and that there was a wall blocking the view of the station from Alter Road. *Id.* at 26. Chenault was Salamey's employee. *Id.* at 27. Salamey also testified that the video surveillance tapes did not show anyone coming into the store to buy pop or anyone in front of the Dollar Store across the street, as against the codefendants' testimony at trial. *Id.* at 28. Salamey gave Edison a copy of the March 19 receipt signed by Senella Gant when he realized it was not in evidence. *Id.* at 29. Salamey

confirmed that Janisch had testified that he never brought weekend proceeds with him on Monday pick-ups, that the Monday, March 21, receipt showed a pick-up of only $4,646, and that therefore petitioner would have no way of knowing that Janisch would be carrying $19,000 that Monday. *Id.* at 31. The court said that Salamey could not be aware of everything that petitioner knew and that trying to discredit Janisch on such a point seemed like misguided trial strategy, while petitioner's counsel argued that it went towards a defense creating reasonable doubt about petitioner's motive. *Id.* at 30-36. The court also pointed out that it doubted the co-conspirators could have cooked up such a plausible story immediately after being arrested. *Id.* at 37. On cross-examination, Salamey testified that he never saw the surveillance video clip played at trial, and that if the transcript reflects that, it is in error. *Id.* at 41. Salamey himself was not present at the station on March 19 or 20, so he cannot personally verify having seen Janisch at the station on those days. *Id.* at 42. The gas station itself had been robbed seven times. *Id.* at 43. The court also inquired about convictions, so on redirect examination, Salamey testified that he had no prior criminal convictions but that petitioner did have one when he was seventeen. *Id.* at 44.

Petitioner also presented the testimony of Senella Gant. Gant testified that she saw the March 21 robbery occur. *Id.* at 46. Janisch had a key to the back office. *Id.* at 47. Gant identified her signature—her initials—on Exhibit B to Defendant's Motion for New Trial, and that Exhibit B was a receipt. *Id.* at 47. She had signed these receipts before, when Janisch had stopped by and neither Salamey nor petitioner were not there. *Id.* at 48. Gant had been interviewed and given a statement, but she could not remember who interviewed her. *Id.* at 48. Chenault had come into the gas station on the morning of the robbery; he made a visit to the back room and came out irate. *Id.* at 50. Gant saw Chenault take petitioner's cell phone to the back room. *Id.* at 53. On cross-examination, she

testified she did not know of any reason why Janisch would have petitioner sign the same receipt that she signed. *Id.* at 54. She did not know of any friendship between Janisch and petitioner outside of their business relationship. *Id.* at 55.

The prosecution presented the testimony of Investigator McClure. McClure testified that he was on the Financial Response Team, formerly Armed Robbery, at the time of the March 21 robbery and that he was one of the officers in charge of the case. *Id.* at 57. McClure obtained a search warrant to procure the hard drive, because he had asked Salamey and petitioner for a copy of the tape but was unsuccessful in getting one. *Id.* at 58. The Michigan State Police downloaded the information from the hard drive. *Id.* at 59. The hard drive was then stored, unplugged, on a shelf in the evidence locker. *Id.* at 59. The tape was not played at trial; stills had been made from the tape that were shown as evidence in court. *Id.* at 59. McClure had received a Bachelor's degree in Information Systems from the University and therefore had a knowledge of computers; he said the hard drive would not rewrite itself if the computer is not plugged in. *Id.* at 60. He did not tell the codefendants to blame petitioner. *Id.* at 61. On cross-examination, McClure testified that the State Police made him a VHS tape with the surveillance footage of the robbery; he instructed the State Police that he only wanted them to download the footage "within the proximity of the robbery." *Id.* at 61-62. It took up to four days before he was able to get an appointment with the State Police. *Id.* at 64. McClure agreed that the images on the hard drive were evidence but that he was only interested in the portion capturing the robbery. *Id.* at 63. To the "best of [his] knowledge," all of the footage was still on the hard drive when he returned it to the Salameys two and a half months later. *Id.* at 65. McClure had taken a statement from Sharod Scott, sister of codefendant Ronald Scott, on March 22, 2005, in which she testified that she immediately knew Chenault was involved and had organized

the robbery.  *Id.* at 66-67.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's

resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Loss of Exculpatory Evidence*

Petitioner contends that he was denied his right to due process because of the loss of material exculpatory evidence, or alternatively the loss of potentially exculpatory evidence in bad faith. petitioner argues that the prosecution failed to download surveillance footage and allowed the hard drive on which video surveillance was captured to rewrite itself, thus deleting the un-downloaded footage. Because the evidence was not material and the prosecution did not act in bad faith, the Court should conclude that the petitioner is not entitled to relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accuse, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also, Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three

elements. *See Carter*, 218 F.3d at 601.

The *Brady* rule extends to evidence which is not suppressed but is lost or destroyed. *See California v. Trombetta*, 468 U.S. 479, 489 (1984). This rule applies only to material exculpatory evidence, that is, evidence which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488-89. However, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In a case involving potentially useful evidence, the defendant must "show bad faith on the part of the police." *Id.*; *see also, Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam). As the Sixth Circuit has explained, *Trombetta* and *Youngblood* establish "[s]eparate tests . . . to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).

Where the *Youngblood* bad faith requirement applies, "[t]he presence or absence of bad faith by the [government] for the purposes of the Due Process Clause must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56. Thus, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied." *Wright*, 260 F.3d at 571; *see also*, *United States v. Garza*, 435 F.3d 73, 75 (1st Cir. 2006). Further, the requirement that a defendant show bad faith is not eliminated by the existence of a

pending discovery request for evidence, *see Fisher*, 540 U.S. at 548, nor does it depend on "the centrality of the contested evidence to the prosecution's case or the defendant's defense[.]" *Id.* at 549.

2.    *Analysis*

The court of appeals's application of clearly established law was objectively reasonable regarding the lost surveillance footage. Petitioner argues that the lost evidence is material, or alternatively, that the police failed to preserve the evidence in bad faith. The court of appeals reasonably concluded that the evidence was neither material nor lost in bad faith.

The evidence was not material because petitioner could have obtained it by other reasonably available means. Petitioner argues that lost surveillance footage would have undermined the credibility of the codefendants by contradicting their testimony that (1) Michael Boyd was across the street at the Dollar Store before the robbery, (2) that Ronald Scott entered the gas station to buy a soda pop, and (3) that Chenault watched the robbery with petitioner in petitioner's car from a location on Alter Road. Pet'r's Mem., at 10. However, Vonique Campbell, the gas station employee working the day of the robbery, in her interview with the police shortly after the robbery, stated that she had seen the perpetrators of the robbery and that none of them had entered the station. Pet'r's Mem., at 27. Salamey also testified to the existence of a wall behind the gas station blocking the view from Alter Road. Pet'r's App., at 199A. Thus petitioner had access to other evidence to undermine the codefendants' credibility on these points, so the lost footage was not material evidence.

It was also reasonable for the court of appeals to find that the police did not act in bad faith. Petitioner alternatively argues that Detective McClure acted in bad faith. The court of appeals

accepted that McClure knew that the hard drive would rewrite itself but found that "Investigator McClure would have no reason to believe that the slight variations in the testimony of the witnesses regarding events on the day of the robbery would require extensive examination of the lengthy surveillance footage. Further, there is absolutely no evidence that Investigator McClure purposely erased the footage from the hard drive or knowingly allowed the hard drive to rewrite." *Salamey*, 2008 WL 3876102, at *2. Petitioner argues that inconsistencies in McClure's testimony point to bad faith. However, it is undisputed that the data was on the hard drive at the point when the state police lab downloaded the footage onto the tape, and thereafter the hard drive was stored unplugged. McClure testified that he thought the system would not rewrite itself while it was unplugged (*Ginther* Hr'g Tr., dated 9/14/07, at 60). Petitioner says that the police activity was "intentional destruction of evidence, or a careless disregard for the preservation of evidence." Pet'r's Mem., at 40. But there is no evidence of intentional destruction of the footage, and even if McClure and the other police were grossly negligent in thinking that the hard drive would not rewrite itself when unplugged, that does not constitute bad faith. Accordingly, it was reasonable for the court of appeals to find that no bad faith occurred on the part of the police involved, and petitioner therefore is not entitled to habeas relief in this claim.

E.      *Sentencing Claim*

Petitioner argues that the trial court's scoring of OV-14 was based on inaccurate information, invoking the rule established in *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972). Because the legal sufficiency of the facts is a state law claim that is not recognizable under habeas review, the Court should conclude that the petitioner is not entitled to relief on this claim.

1.      *Clearly Established Law*

In *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972), "the United States Supreme Court invalidated defendants' sentences because they were imposed by trial courts in reliance upon material false assumptions of fact." *Eutzy v. Dugger*, 746 F.Supp.1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F.Supp. 1139, 1144 (N.D. Ill. 1995) (same). *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41. It is well established, however, that a *Tucker* violation arises only where the improper information "actually served as the basis for the sentence." *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003); *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir. 1985). "A sentencing court demonstrates reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Lechner*, 341 F.3d at 639 (quoting *Tucker*, 404 U.S. at 444, 447). Thus, to be entitled to habeas relief on this claim petitioner "must show that the sentencing court actually relief on this information and that it was materially false." *Hanks v. Jackson*, 123 F.Supp. 2d 1061, 1074 (E.D. Mich. 2000) (Gadola, J.).

2.      *Analysis*

Petitioner's claim that the trial court erred in scoring OV-14 does not raise a cognizable claim for habeas relief. Petitioner contends that the trial court erred in scoring OV-14, claiming that the 10-point assessment for petitioner's leadership role, Mich. Comp. Laws § 777.44, is based on "sheer speculation" about whether petitioner "drew the others into the crime," Pet'r's Mem., at 47. Petitioner highlights the criminal histories of co-defendants Fegan, Chenault, and R. Scott to make

the point that it is only speculation that the crime would not have been committed but for petitioner's influence. Pet'r's Mem., at 48. Contrary to petitioner's argument, there was evidence adduced at trial, through the testimony of petitioner's co-conspirators, that petitioner came up with the idea for the robbery and played a leading role in planning it. Thus the trial court's finding of leadership is a legal determination based on petitioner's convicted behavior. Petitioner's argument does not assert reliance on any materially false *factual* assumptions made by the trial court about petitioner's involvement in the crime; it is directed at the *legal* effect given to the facts by the trial court.

Additionally, the legal sufficiency of the facts to support a scoring of 10 points under OV-14 is a question of state law that is not cognizable on habeas review. A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). The legal sufficiency of the facts to support a scoring of 10 points under OV-14 is a question of state law which is not cognizable on habeas review. MICH. COMP. LAWS § 777.44. Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). petitioner's claim that the court improperly scored the guidelines range raises an issue of state law that is not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also*, *Brenan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).

Further, a *Tucker* violation arises only where the improper information "actually served as the basis for the sentence." *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner*, 341 F.3d at 639. In this case, even with the ten additional points added to petitioner's OV-14 for a leadership role in the crime, the bump up in points did not affect petitioner's sentence range. Pet'r's App., Sentencing Tr., at 248A. Without the ten points, petitioner's OV level would have been twenty; with the additional ten points, it was at thirty. Petitioner's convicted behavior of armed robbery and conspiracy to commit armed robbery is Class A for the purposes of minimum sentence ranges. *See* MICH. COMP. LAWS § 777.16y. On this grid, both twenty points and thirty points would fall into range II. *See* MICH. COMP. LAWS § 777.62. Thus, since the additional points did not affect which range petitioner was in, the information cannot be said to have served as the basis for the sentence. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Ineffective Assistance of Counsel*

Petitioner also raises a number of claims challenging the assistance rendered by his trial and appellate attorneys, arguing that counsel failed to investigate potential witnesses and evidence and failed to object to inappropriate evidence. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that of course should be followed." *Id.* at 670.

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.     *Failure to Investigate and Call Witnesses*

Petitioner first contends that counsel was deficient for failing to investigate potential witnesses and testimony. Petitioner argues that counsel was ineffective because of his "failure to investigate and establish all substantial defenses available to petitioner; . . . [and his] waiver of Senella Gant's testimony, which directly contradicted the testimony of the victim, Tyson Janisch, and thereby undercut petitioner's alleged motive to commit the robbery. . . ." Pet'r's Mem., at 14.

Petitioner argues that Gant's testimony about her signing a receipt for Saturday, March 19, could have undermined Janisch's testimony that he did not make a pick-up over the weekend. However, there is no evidence that the date on the receipt showed the actual date of pick-up and would have even supported petitioner's argument. To keep the accounting straight, receipts could be dated for the day proceeds were taken in rather than the day they were picked up. Indeed, the prosecution introduced separate spread sheets generated by the station for each day's receipt. *See* Answer, at 6. The undisputed fact that $19,124 was recovered, Pet'r's Mem., at 15; Answer, at 5, supports this. Additionally, there is no showing of prejudice anyway, because Janisch's credibility is not a key factor. He did not testify about petitioner's involvement. It is undisputed that the robbery occurred—the question is whether petitioner was involved. As far as petitioner's motive is concerned, whether or not Janisch made a Saturday pick-up, Janisch would still have been picking up thousands of dollars on Monday. Even if it would not have been as much, there would still be a motive. Thus counsel was not deficient for waiving Senella Gant's testimony.

Petitioner also argues that counsel was deficient for failure to call petitioner's father, Salamey, as a witness because his testimony about the lost video surveillance footage would have contradicted codefendants' version of events and undermined their credibility. Petitioner argues that counsel was deficient for "failure to investigate and introduce relevant and material evidence available to him which directly contradicted the credibility of the alleged co-conspirators' testimony and undercut petitioner's alleged motive for the robbery and refuted his opportunity to commit the robbery; . . . and failure to call petitioner's father, Mohamed Salamey, as a witness. . . ." Pet'r's Mem., at 14. However, counsel had already worked to undermine the codefendants' testimony at trial, *Ginther* Hr'g Tr, dated 8/24/07, at 25, and he did so extensively through his cross-examination

at trial. It is not reasonably probable that an attempt to impeach them slightly more through the testimony of petitioner's father, who was far from disinterested, would have made a difference in the jury's determination of their credibility. Thus petitioner cannot show that he was prejudiced by counsel's failure to call petitioner's father as a witness.

       3.    *Failure to Object to and Seek Relief for Inappropriate Evidence*

Petitioner also contends that counsel was ineffective for failing to object to and seek relief for the surveillance video clip used as evidence. Petitioner argues that counsel was deficient for "failure to object to the admission of the video surveillance tape that had been edited to delete vital information critical to petitioner's defense; failure to seek appropriate relief for the prosecution's deletion and destruction of evidence pertaining to the video surveillance tape; [and] failure to object to admission of the video surveillance tape based on discovery violations." Pet'r's Mem., at 14. The admission of the videotape itself was not objectionable because it accurately depicted the robbery. That the video showed the actual robbery is not disputed; thus it was appropriately admitted into evidence. As far as the loss of the peripheral surveillance footage, petitioner could not show that the lost footage was material evidence or that the police acted in bad faith, *see supra*, part D.2, so counsel was not deficient for failure to bring an empty claim.

Thus, for the aforementioned reasons, petitioner has not shown that his trial counsel was ineffective.

G.    *Recommendation Regarding Certificate of Appealability*

       1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge

issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a

certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendations regarding the merits of petitioner's claims, it should also deny petitioner a certificate of appealability because the Court's resolution of his claims is not debatable among reasonable jurists. The court of appeals's judgment regarding petitioner's claim of denial of due process in the loss of evidence was clearly a reasonable application of established law because the evidence was not material and the prosecution did not act in bad faith. Further, it is not reasonably debatable that the legal sufficiency of the facts to support the scoring of OV-14 is a state law claim not cognizable under habeas review. Finally, the court of appeals's judgment regarding petitioner's claim of ineffective trial counsel was clearly reasonable because counsel's decisions were reasonably strategic and any lack of investigation did not prejudice petitioner. Thus, the Court should deny petitioner the certificate of appealability.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny

petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                            s/Paul J. Komives
                                            PAUL J. KOMIVES
                                            UNITED STATES MAGISTRATE JUDGE
Dated: 6/30/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on June 30, 2010.

s/Eddrey Butts
Case Manager

38